# UNITED STATES DISTRICT COURT

# DISTRICT OF SOUTH DAKOTA

# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JADE LAROCHE,<br><br>Defendant. | 3:22-CR-30003-RAL<br><br>**REPORT AND RECOMMENDATION FOR DISPOSITION OF MOTION TO SUPPRESS EVIDENCE** |

In this assaulting a federal officer case, Jade LaRoche moves to suppress statements he made when an officer tried to arrest him at his mother's house. But because LaRoche was not interrogated while in custody and made voluntary statements to the officer, his suppression motion should be denied.

## BACKGROUND

Around 2:30 a.m. on October 31, 2021, Josephine Skunk called local dispatch to report that her son, LaRoche, was acting up and she wanted someone to come resolve the situation. Dispatch apprised Justin Schmiedt, a Bureau of Indian Affairs (BIA) officer, of the call and he headed toward Skunk's home in the Lower Brule community. Along the way, Schmiedt confirmed, through dispatch, that LaRoche had an active Lower Brule Sioux Tribe arrest warrant but did not know what the warrant was for.

Upon arriving at the residence, Schmiedt knocked on the front door and Skunk invited him in.

As Schmiedt stood in the living room, Skunk informed him that she and LaRoche had a falling-out. She advised LaRoche that Schmiedt was there and had LaRoche join them in the room. There, Schmiedt and LaRoche conversed for about 14 minutes.

Schmiedt notified LaRoche of the arrest warrant at the outset of the conversation. LaRoche acknowledged knowing of the warrant and asked if Schmiedt had spoken with BIA Officer Moran about it. Schmiedt had not and told LaRoche as much. LaRoche began talking about Moran, the warrant, and himself before Schmiedt asked, "So, what's the warrant for? Do you know what it's for?" LaRoche professed that he "was supposed to go to treatment," then initiated a lengthy explanation of the circumstances surrounding the issuance of the warrant and his life situation. Schmiedt allowed LaRoche to vent, contributing the occasional cursory interjection and clarifying question to the confab.

But as the dialogue continued, LaRoche became increasingly anxious. His eyes started to dart around the home, and he began to shift about on his feet. Noting the change in demeanor and after giving LaRoche plenty of time to speak his piece, Schmiedt declared that, "So far as tonight goes okay, I'm going to have to take you because you got that warrant." After this, when a brief attempt to cajole his way out of the impending arrest was ineffective, LaRoche bolted.

LaRoche fled through the kitchen and into the connecting garage, where he stayed, that had a large blanket covering the doorway, top to bottom. Skunk warned Schmiedt there was a back door to the garage through which LaRoche might escape. As Schmiedt prepared to enter the garage with Taser and flashlight in hand, LaRoche rushed out from behind the blanket and knocked Schmiedt down. In response, Schmiedt deployed his Taser twice, but to no avail. LaRoche absconded out the front door of the house and vanished into the darkness.

A federal grand jury later indicted LaRoche on one count of assaulting, resisting, and impeding a federal officer. LaRoche moved to suppress what he said after Schmiedt asked about the arrest warrant.[1] The government resisted suppression.[2] The Court held a hearing on LaRoche's motion, at which Schmiedt testified,[3] and then supplemented the evidentiary record with a dash cam recording of Schmiedt and LaRoche's colloquy in the home.[4]

---

[1] Docket No. 20.

[2] Docket No. 26.

[3] Mot. Hr'g Tr. 4-50 (June 8, 2022).

[4] Docket Nos. 30, 31; *see also* Mot. Hr'g Tr. 52-53 (granting government's request to leave the record open to see if Schmiedt's dash cam captured the dialogue inside the residence or anything else pertinent to the suppression motion).

## DISCUSSION

### A. Miranda

LaRoche first claims that his statements were obtained in violation of *Miranda*.[5] He experienced custodial interrogation, he says, with no *Miranda* advisement. The issue is whether LaRoche was in custody and interrogated before he took off. If so, his statements must be suppressed because he was never Mirandized. If not, *Miranda* provides him no avenue for exclusion of the statements.

Reinforcing the Fifth Amendment, the *Miranda* decision requires law enforcement to warn suspects of their rights before engaging in custodial interrogation.[6] Interrogation is any question, word, or action that an officer should know is "reasonably likely to elicit an incriminating response."[7] Custody,[8] for purposes of *Miranda*, occurs when: (1) a suspect is formally arrested, or (2) the suspect's "freedom of movement" is restricted to a "degree associated with a formal arrest."[9] In determining

---

[5] Docket No. 21 at 2-5; *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] *Miranda*, 384 U.S. at 478-79 (setting forth the rights a suspect, who is taken into custody, must be advised of before being questioned to safeguard the privilege against self-incrimination).

[7] *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

[8] *See Howes v. Fields*, 565 U.S. 499, 508-09 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.").

[9] *California v. Beheler*, 463 U.S. 1121, 1125 (1983).

the extent to which a suspect's freedom of movement was restricted, a court examines the circumstances surrounding the interrogation and whether a reasonable person would "have felt he or she was at liberty to terminate the interrogation and leave."[10]

Certain "relevant factors," the Supreme Court has instructed, should be considered in the custody determination, including, "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of [the suspect] at the end of the questioning."[11] The Eighth Circuit has also set forth common "indicia" which tend to either mitigate or aggravate an atmosphere of custodial interrogation.[12] These indicia, while useful, are not dispositive or exhaustive.[13] They are merely one way to determine whether the suspect's movement was curtailed, as if he were under formal arrest, and subjected to the same inherently coercive pressures as the station house questioning at issue in *Miranda*.[14]

---

[10] *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011).

[11] *Howes*, 565 U.S. at 509.

[12] *See United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990).

[13] *See id.; see also United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011); *United States v. Brave Heart*, 397 F.3d 1035, 1039 (8th Cir. 2005); *United States v. Czichray*, 378 F.3d 822, 827 (8th Cir. 2004).

[14] *See Howes*, 565 U.S. at 509.

Skunk invited Schmiedt, who was by himself, into her home.[15] She then called LaRoche to come out to the living room.[16] While Schmiedt mentioned the arrest warrant early in the conversation, "you know you got that warrant on you," he did not arrest LaRoche or deprive LaRoche of his liberty in a manner tantamount to a conventional arrest.[17]

LaRoche and Schmiedt spoke with each other, in conversational tones and in Skunk's presence, for a while about LaRoche's life, past issues, and the circumstances preceding the warrant's issuance.[18] LaRoche controlled the conversation and did most of the talking.[19] Schmiedt did not announce that he was taking LaRoche in (arresting

---

[15] *See* Mot. Hr'g Tr. 16 ("Q. And you approached the front door. Josephine lets you in? A. Correct.").

[16] *See* Mot. Hr'g Ex. 1 at 03:06-03:08 (June 13, 2022) ("Cops are here to talk to you."); Mot. Hr'g Tr. 35 ("Q. Ms. Skunk was the one that called for him to come to … the living room area; is that correct? A. That is correct….").

[17] *See* Mot. Hr'g Tr. 34 ("A. [H]e wasn't in handcuffs at any point in time. Q. Did you block his ability to move at all, whether it was in the living room or the front room or elsewhere? A. No…. At no point in time did I … put him in a corner where he couldn't go or move freely throughout the house.").

[18] *See* Mot. Hr'g Ex. 1 at 03:21-17:10; *see also* Mot. Hr'g Tr. 18, 43 (explaining the importance of having rapport and cooperation and not grabbing or putting hands on people with warrants without telling them what's going on).

[19] *See* Mot. Hr'g Ex 1 at 03:21-17:10.

him) until the very end of the discourse.[20] Then, when his last ditch effort to persuade

Schmiedt to give him a break failed, LaRoche skedaddled.[21]

The conversation: (1) was relatively brief, amicable, and one LaRoche steered;[22]

(2) took place in a familiar and relaxed setting and in the company of LaRoche's

mother;[23] (3) did not involve any display of weapons, physical force, or heavy-handed

tactics on the part of Schmiedt;[24] (4) went on without restraint to LaRoche's freedom of

movement;[25] and (5) ended when LaRoche scampered off to the garage (his bedroom)

---

[20] *See* Mot. Hr'g Ex. 1 at 17:15-17:18 ("So as far as tonight goes okay, I'm going to have to take you because you got that warrant."); Mot. Hr'g Tr. 36 ("Q. And when was it, in the scheme of things, that you announced to Mr. LaRoche that he was under arrest or going to be placed under arrest? A. We'd come to a – the end where I had listened to him. I gave him time to explain what's been going on in his life and his life situation.").

[21] *See* Mot. Hr'g Tr. 36 ("A. [H]e asked me not to arrest him. I said it wasn't a negotiation. And right when I said "You're under arrest" is when he fled….").

[22] *See* Mot. Hr'g Ex. 1 at 03:21-17:10.

[23] *See Czichray*, 378 F.3d at 826 ("When a person is questioned 'on his own turf,' we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'"); *Griffin*, 922 F.3d at 1355 n.15 ("an interrogation in familiar surroundings such as one's home softens the hard aspects of police interrogation and moderates a suspect's sense of being held in custody.").

[24] *See* Mot. Hr'g Tr. 34-35 ("At no point in time did I put my hands on him…. [A]t no point was my handgun taken out of its holster. As far as the Taser, it would have been taken out right in that kitchen area, as I was preparing to go into the back room….").

[25] *See id.* at 33-35.

and then out the front door.[26] That LaRoche was never told he was free to leave is not dispositive.[27] Based on the totality of the circumstances, a reasonable person, in LaRoche's position, would not have understood he was in custody until Schmiedt said he had to execute the warrant and take LaRoche into custody.[28]

Regardless, none of Schmiedt's inquiries amounted to impermissible interrogation. His questions, "So, what's the warrant for? Do you know what it's for,"[29] were not interrogatory. Given their context,[30] they were designed to help him assess the

---

[26] *See id.* at 37-39.

[27] *See United States v. Flores-Sandoval*, 474 F.3d 1142, 1147 (8th Cir. 2007) (finding no custody even when suspect was not advised that he was free to leave).

[28] *See Beckwith v. United States*, 425 U.S. 341, 343-48 (1976) (three-hour interrogation in dining room of residence was not so inherently coercive to require compliance with *Miranda's* prophylactic rule); *United States v. Giboney*, 863 F.3d 1022, 1028 (8th Cir. 2017) (suspect's freedom of movement not to be restrained when detective escorted him to bathroom and outside for a smoke); *Czichray*, 378 F.3d at 830 (finding that defendant, accompanied by law enforcement to his bedroom and bathroom during questioning, was not in custody for purposes of *Miranda*); *see also United States v. Circle Bear*, 3:14-CR-30122-RAL, 2015 WL 1969413, at *4-5 (D.S.D. May 1, 2015) (defendant not in custody when questioned briefly by one officer in hotel room without restraints, deception, or strong arm tactics); *United States v. Long*, 30 F.Supp.3d 835, 865 (D.S.D. 2014) (no custody when officer did not tell suspect that he was able to leave but suspect was free to move around near his home in the open air and the encounter was brief, friendly, and voluntary).

[29] Docket No. 21 at 5; Mot. Hr'g Ex. 1 at 05:11-05:20.

[30] *See* Mot. Hr'g Tr. 15 ("Q. Did they tell you whether it's an arrest warrant? There's a bond? Anything else? A. Typically, they do not go into details. We need to go back to the police department and grab the hard copy.").

situation he faced and clarify LaRoche's earlier statements[31] and not to expand the scope of them and enhance LaRoche's guilt.[32] LaRoche's other statements were either spontaneous or arose from Schmiedt's follow-up of volunteered information.[33] Schmiedt's queries did not create culpability for LaRoche or worsen his predicament.[34]

---

[31] *See* Mot. Hr'g Ex. 1 at 03:12-04:09 (Schmiedt: "Okay, you know you got that warrant on you." LaRoche: "Yeah but…. You talk to Moran, right? … [H]e just told me to please take care of it you know. I've been minding by own business…" Schmiedt: "When? I don't know what you're talking about bud. I'm just here on that warrant, that's it." LaRoche: "… I mean you can't talk to Moran and maybe let me, because I will, it's a DLOC warrant.").

[32] *See Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment"); *United States v. Jackson*, 852 F.3d 764, 771-74 (8th Cir. 2017) (limited follow-up to volunteered statement did not constitute interrogation); *United States v. Chipps*, 410 F.3d 438, 445-46 (8th Cir. 2005) (when defendant volunteered he knew one FBI agent was looking for him and another agent asked how long defendant had known about the warrant, that was only a request for clarification and not an attempt to enhance defendant's guilt); Mot. Hr'g Ex. 1 at 03:58-05:20.

[33] *See United States v. Becerra*, 958 F.3d 725, 729-30 (8th Cir. 2020) (no interrogation when follow-up question to suspect's prior volunteered statement was intended to clarify rather than enhance guilt or expand scope of inquiry); *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989) (agent's question about how long defendant knew of warrant did not enhance guilt because defendant's volunteered statement indicated he had known of warrant for some time); *United States v. Tail*, CR04-50026-01-KES, 2005 WL 2114227, at *3 (D.S.D. Aug. 31, 2005) ("Clarification of volunteered information qualifies as interrogation only if it attempted to enhance [ ] defendant's guilt.").

[34] *See generally* 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, *Criminal Procedure*, § 6.7(d) (4th ed. 2015 & Nov. 2021 update) ("Volunteered" statements and follow-up questioning).

Lacking both custody and interrogation, LaRoche cannot prevail on his *Miranda* claim. That portion of his suppression should accordingly be denied.

## B. Voluntariness

LaRoche next claims that his statements were involuntary under the Fifth Amendment. He points to these circumstances that, when combined, he says overbore his will and critically impaired his capacity for self-determination:

1. The time (during the wee hours of the morning), manner (asked incriminating and unnecessary questions), and location (his mother's living room) of the interrogation; and
2. Schmiedt's attire (BIA uniform), room position (blocking the front door), weapon on his person (Taser), and suspicions (LaRoche may be under the influence).[35]

The Court is not persuaded.

When statements to law enforcement are "the product of an essentially free and unconstrained choice by their maker," they are voluntary.[36] Statements are not considered involuntary unless the police extorted them from the accused through coercive activity.[37] Coercive police activity is a necessary predicate to finding that

---

[35] Docket No. 21 at 5-6.

[36] *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973).

[37] *United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (cleaned up).

statements are not voluntary under the Due Process Clause.[38] Voluntariness is judged by the totality of the circumstances.[39]

Neither the recording nor Schmiedt's testimony offer any hint of coercive or improper conduct from Schmiedt.[40] And as an adult with extensive experience in the criminal justice system,[41] LaRoche did not show any hesitancy about speaking to Schmiedt during the short-lived interaction.[42] Nothing Schmiedt said or did undermined LaRoche's free-will and decision-making abilities. LaRoche's flight—to the garage and from the house—is proof positive of this. LaRoche made his statements voluntarily. As a result, they are admissible as substantive evidence against him at trial.

## CONCLUSION

LaRoche was not in custody or interrogated while in his mother's home. So no *Miranda* warnings were necessary. His statements were likewise voluntary and not the product of compulsion on Schmiedt's part. The government may use them, therefore, as trial evidence in its case-in-chief.

---

[38] *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

[39] *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004) (*en banc*).

[40] *See generally* Mot. Hr'g Tr; Mot. Hr'g Ex. 1.

[41] *See* Docket No. 7 at 2-12 (detailing LaRoche's criminal history); Mot. Hr'g Ex. 1 at 08:47-08:50 ("So, I've been to prison, you know like I said, 16, 17 years.").

[42] *See* Mot. Hr'g Ex. 1 at 03:10-14:72; Mot. Hr'g Tr. 36 ("Q. At any point in time, was Mr. LaRoche reluctant to talk … about the warrant or anything that related to it? A. No….").

## RECOMMENDATION

In accordance with the authorities and legal analysis set forth in this report, and the record now before the Court, it is

RECOMMENDED that LaRoche's Motion to Suppress Evidence[43] be denied.

## NOTICE

The parties consented to a seven-calendar day objection period (agreeing to cut the prescribed time[44] in half). They thus have seven days after service of this report and recommendation to file their objections to the same. Unless an extension of time for cause is later obtained,[45] failure to file timely objections will result in the waiver of the right to appeal questions of fact.[46] Objections must "identify[] those issues on which further review is desired[.]"[47]

Dated this 21st day of June, 2022, at Pierre, South Dakota.

---

[43]Docket No. 20.

[44]*See* 28 U.S.C. §636(b)(1); Fed. R. Crim. P. 59(b).

[45]*See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Nash v. Black*, 781 F.2d 665, 667 & n.3 (8th Cir. 1986) (*citing Thomas v. Arn*, 474 U.S. 140, 155 (1985)).

[46]*See Thompson*, 897 F.2d at 357; *Nash*, 781 at 667.

[47]*Arn*, 474 U.S. at 155.

BY THE COURT:

_____

**MARK A. MORENO**
**UNITED STATES MAGISTRATE JUDGE**